**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BARBARA BROWN, o/b/o S.W.,**

               **Plaintiff,**

    **vs.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

              **Defendant.**
_____

**1:05-CV-0985**
**(NAM/RFT)**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| Legal Aid Society of Northeastern<br>  New York, Inc.<br>112 Spring Street, Suite 109<br>Saratoga Springs, New York 12866<br>_Attorney For Plaintiff_ | Mary M. Withington, Esq. |
| Glenn T. Suddaby<br>United States Attorney for the<br>Northern District of New York<br>P.O. Box 7198<br>100 South Clinton Street<br>Syracuse, New York 13261-7198<br>and | William H. Pease, Esq.<br>Assistant United States Attorney |
| Office of General Counsel<br>Social Security Administration<br>26 Federal Plaza<br>New York, New York 10278<br>_Attorneys For Defendant_ | Barbara L. Spivak, Esq.<br>Chief Counsel, Region II<br><br>Sam Ramrup, Esq.<br>Assistant Regional Counsel |

**Norman A. Mordue, Chief U. S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

_____

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007. Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

## I.     INTRODUCTION

In this action, plaintiff Barbara Brown, on behalf of her minor stepson, Shaquille, moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying Shaquille's application for childhood disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.     BACKGROUND

Shaquille was born on July 1, 1995 and was 8 years old at the time of the administrative hearing on June 25, 2004. (Administrative Transcript at p. 34, 40).[2]   Shaquille resides at 6 Bogart Terrace in Albany, New York with plaintiff, his stepmother and legal guardian. (T. 33).  Shaquille was diagnosed with post traumatic stress disorder with psychosis, possible ADHD, dysthymia and depressive disorder.[3] (T. 90, 153).   Plaintiff claims Shaquille became disabled on December 1, 1996.[4]  (T. 40).

### A.     Medical Evidence

#### 1.     Joan Franco - Child Therapist

On February 18, 2003, Ms. Franco, a therapist at the County of Albany Crime Victim and Sexual Violence Center, prepared a Telephone Memorandum regarding a call received from plaintiff.  (T. 166). Plaintiff stated that Shaquille came to live with her and his biological father in

---

[2]  Portions of the administrative transcript, Dkt. No. 13, will be cited herein as "(T.__)."

[3]  Dysthymia is a mood disorder characterized by depressed feeling, loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self esteem, poor concentration or decision-making skills, and feelings of hopelessness.  *Dorland's Illustrated Medical Dictionary*, (31st ed. 2007).  ADHD is an abbreviation for Attention Deficit Disorder with Hyperactivity. http://www.medilexicon.com (last visited July 10, 2008).

[4]  The "recommended onset date" is March 1, 2003. (T. 77).

June 2002. (T. 169).  Plaintiff stated that Shaquille recently disclosed to her that he was sexually abused by his biological mother's boyfriend. (T. 166).  Plaintiff also claimed that Shaquille witnessed the murder of his 22 month old sister by his biological mother's ex-boyfriend. (T. 169).

From February 2003 until January 2004, Shaquille attended one-hour counseling sessions with Ms. Franco on a weekly basis.[5] (T. 179).  The types of services provided during these sessions are described as "crisis intervention" and "criminal justice". (T. 173-179).  On July 17, 2003, Ms. Franco wrote a letter to Albany County Mental Health describing her work with Shaquille. (T. 138).  Shaquille underwent an evaluation at Albany County Mental Health at the request of Ms. Franco.  Ms. Franco stated that she treated Shaquille weekly regarding his sexual abuse, nightmares and behavioral difficulties. (T. 138).  Ms. Franco described Shaquille as "guarded" with a "muted demeanor" and "flat affect". (T. 138).  Ms. Franco stated that Shaquille "engaged in conversation freely and is able to speak about his abuse". (T. 138).   Ms. Franco stated that Shaquille had been hearing voices and noises which he described as "scary".  (T. 138).

In September 2003, Ms. Franco noted that plaintiff called with an "update on Shaquille's condition". (T. 177).  Plaintiff advised that Shaquille was suspended from school and that his behavior had "regressed". (T. 177).  Ms. Franco noted "Shaquille has not been seen in many weeks" and that Shaquille was receiving bi-weekly therapy from Vera Imperiale at Patriot Psychiatric Group.  (T. 177).  In January 2004, Shaquille had his last visit with Ms. Franco.  (T. 179).

---

[5] The records from Ms. Franco are sparse and consist of pre-printed forms entitled "Counseling Follow-up" which provide the date, length of the session and administrative information.  (T. 173).

### 2.     Albany County Mental Health

On March 14, 2003, Barbara Gabriel-Catalano, a social worker at Albany County Mental Health ("ACMH"), prepared a telephone memorandum regarding a call received from plaintiff. (T. 86). Plaintiff advised Ms. Gabriel-Catalano that Shaquille was abused when he was 4 or 5 and that he just began receiving counseling from Joan Franco at Crime Victims. (T. 86).  Plaintiff advised that she was concerned because Shaquille "heard voices" during the night. (T. 86).  Ms. Gabriel-Catalano told plaintiff that Shaquille should continue to receive counseling from Ms. Franco and that plaintiff should "call back if she felt [counseling] was unsuccessful". (T. 86).  On March 20, 2003, plaintiff telephoned regarding Shaquille's difficulty sleeping, behavior and continuing nightmares. (T. 85).  At the conclusion of the conversation, Ms. Gabriel-Catalano scheduled Shaquille for an evaluation.  (T. 85).

On April 4, 2003, Jennifer Eslick, a staff social worker, prepared a telephone memorandum indicating that Shaquille missed his scheduled appointment due to weather conditions. (T. 84).  Ms. Eslick spoke with plaintiff and noted that Shaquille's situation was no longer a "crisis" but that Shaquille still had headaches and nightmares.  (T. 84).  Ms. Eslick noted that Shaquille was receiving counseling through his school and with Ms. Franco. (T. 84).  Ms. Eslick recommended that Shaquille seek treatment from his primary care doctor for his headaches and that Shaquille should continue with counseling. (T. 84).

On June 25, 2003, Shaquille was evaluated by Ms. Gabriel-Catalano at the plaintiff's request. (T. 135).  Plaintiff advised Ms. Gabriel-Catalano that Shaquille heard voices, hallucinated and experienced nightmares that he described as "scary and dangerous". (T. 135).  Plaintiff advised that Shaquille had difficulties in school and that he was manipulative and untruthful. (T. 135).

Upon examination, Ms. Gabriel-Catalano noted that Shaquille provided "one word" answers and appeared "depressed and angry". (T. 136). Shaquille reported hearing adult voices and stated that "the devil tried to take over his head". (T. 136). Ms. Gabriel-Catalano recommended "the Healy House for stabilization" or Patriot Psychiatric for an evaluation. (T. 136). Ms. Gabriel-Catalano also provided plaintiff with information regarding special education services. (T. 136).

### 3.    St. Peter's Hospital Clinic - Pediatrician

On February 27, 2003, Shaquille was treated at St. Peter's Hospital Clinic. (T. 82). The attending physician, Mark Osborn, M.D., noted that Shaquille recently told his stepmother that he had been sexually abused by his mother's former boyfriend on a daily basis. (T. 82). A nurse practitioner noted that Child Protective Services was involved and that Shaquille was undergoing educational testing to "rule out any learning disability".[6] (T. 83). Upon examination, the nurse practitioner noted that Shaquille was a "pleasant child" with "normal growth". (T. 83). The nurse noted the presence of two small circular scars on Shaquille's mid back but noted that Shaquille denied ever being burned. (T. 116).

On June 20, 2003, Shaquille returned to St. Peter's Hospital Clinic for a "stuffy nose" however, the attending nurse noted that "therapist feels he needs more intensive psychiatric intervention - having hallucinations". (T. 111). The nurse diagnosed Shaquille with "PTSD". (T. 112).[7]

---

[6] The name of the nurse practitioner is illegible. (T. 116).

[7] PTSD is an abbreviation for post traumatic stress disorder.  http://www.medilexicon.com (last visited July 10, 2008).

####        4.        Patriot Psychiatric Group

On July 24, 2003, Shaquille underwent an initial evaluation at Patriot Psychiatric Group by Vera Imperiale, NPP.[8] (T. 162).  Plaintiff provided Shaquille's history of abuse and difficulties in school. (T. 160).  Plaintiff stated that Shaquille could not stay focused and that he recently moved schools but that he had not improved. (T. 160).  Plaintiff advised that Shaquille was "aggressive" when he played with other children, heard voices, and was manipulative and dishonest. (T. 160).

Nurse Imperiale performed a mental status examination and found that Shaquille displayed normal speech, thought processes and knowledge. (T. 158).  Nurse Imperiale noted that Shaquille did not display any delusions or suicidal/homicidal tendencies. (T. 158).   Nurse Imperiale diagnosed Shaquille with post traumatic stress disorder, depressive disorder and past abuse and prescribed Paxil.[9] (T. 162).

On August 7, 2003, a progress note prepared by Nurse Imperiale indicated that Shaquille was "calming" while on medications but that he still had visual hallucinations. (T. 156).  Nurse Imperiale prescribed Risperdal for Shaquille's hallucinations.[10]  (T. 156).  On September 3, 2003, plaintiff indicated that Shaquille's affect was "stiff" and that he did not smile. (T. 155).  Nurse Imperiale changed Shaquille's medications and prescribed Zyprexa and Zoloft.[11]  (T. 155).  On

---

[8] NPP is an abbreviation for Psychiatric Nurse Practitioner.  http://www.medilexicon.com (last visited July 10, 2008).

[9] Paxil is used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders; administered orally.  *Dorland's* at 1405, 1419.

[10] Risperdal is used as an antipsychotic agent.  *Id.* at 1674.

[11] Zyprexa is used as an antipsychotic in the management of schizophrenia and for short-term treatment of manic episodes in bipolar disorder.  *Id.* at 1336, 2125.  Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders.  *Id.* at 1724, 2120.

September 29, 2003, Shaquille stated that he "felt fuzzy" but that "the voices went away" and he was able to sleep. (T. 154).  The nurse noted that Shaquille "put a boy in a headlock and choked him yesterday", that he was accused of "stealing and lying in school" and that "kids at school pick on him".  (T. 154).  Nurse Imperiale increased Shaquille's dosage of Zoloft. (T. 154).  In October 2003, Nurse Imperiale noted that Shaquille's behavioral problems at school were continuing. (T. 153).  Nurse Imperiale noted that Shaquille may suffer from ADHD and requested that Shaquille's teacher complete ADHD "scales".  (T. 153).  In November 2003, Nurse Imperiale noted that Shaquille no longer heard voices and that he was "better in school". (T. 152).

In December 2003, Shaquille stated that he "knocked 2 kids heads together in school". (T. 151).  Nurse Imperiale noted that Shaquille denied hearing voices but plaintiff indicated that Shaquille's behavior was still poor. (T. 151).  Shaquille said he was happy but "hit the kids for no reason". (T. 151).  Upon examination, Nurse Imperiale noted that Shaquille's mood was neutral and that he appeared embarrassed by his actions. (T. 151).  The nurse diagnosed Shaquille with depressive disorder with psychosis and mood instability and increased his medications. (T. 151).

In March 2004, Nurse Imperiale noted that Shaquille had not been seen since December 2003. (T. 150).  Plaintiff stated Shaquille's anger had increased and that "the voices and hallucinations had returned". (T. 150).  Nurse Imperiale noted that Shaquille suffered from an increase in psychosis and increased his dosage of Zyprexa. (T. 150).

On June 9, 2004, Shaquille had his last visit at Patriot Psychiatric. (T. 148).  Nurse Imperiale noted that Shaquille was "doing better" and that he was "no longer seeing monsters but

still heard voices". (T. 148). Nurse Imperiale advised plaintiff to discontinue Zyprexa in the morning and prescribed Seroquel.[12] (T. 148).

### B.    Academic Records and Evaluations

#### 1.    Academic Year 2002 - 2003 - Second Grade

According to the evidence in the record, Shaquille was in second grade at Giffen Elementary School (P.S. 18) in Albany. Shaquille's progress records indicate that he read "above grade level" but that he needed improvement in all literacy skills and work habits/behaviors. (T. 119).

Shaquille's disciplinary records from the 2002 - 2003 school year indicate that Shaquille was suspended from school for one day for fighting and for three days for stealing. (T. 130, 132). Disciplinary records also indicate that Shaquille had been absent/tardy on several occasions. (T. 131).

#### 2.    Academic Year 2003 - 2004 - Third Grade

Shaquille began third grade at Giffen Elementary School. On September 16, 2003, Shaquille was suspended from school for one day for choking a student in the bathroom. (T. 133).

On October 19, 2003, Shaquille's teacher, Elizabeth Schofield, completed a NICHQ Vanderbilt Assessment Scale and noted that Shaquille "very often" talked excessively, blurted out answers, lost his temper, lied to obtain goods or avoid obligation and stole items of nontrivial value.[13] (T. 123). Ms. Schofield also indicated that Shaquille had "somewhat of a problem" with

---

[12] Seroquel is used as an antagonist to multiple neurotransmitter receptors in the brain, used as an antipsychotic in the treatment of schizophrenia and other disorders. *Dorland's* at 1590, 1723.

[13] The NICHQ (National Initiative for Children's Healthcare Quality) Vanderbilt Assessment Scale is utilized by teachers to evaluate a child fro ADHD. http://nichq.org (last visited July 21, 2008).

written expression, relationships with peers, disrupting class and completing assignments. (T. 124).

Shaquille's Mid-Year Progress Records indicate that he transferred to Montessori Magnet School.[14]   In the progress reports, Shaquille's teacher described Shaquille as "a very bright child when he chooses to put effort into a task" and noted that "he has come a long way since he came to MMS".  (T. 122).  Shaquille's teacher noted that he often rushed through work and became angry when asked to fix his work.  (T. 122).  Shaquille's teacher further stated that "he sometimes takes things that aren't his which makes it difficult for the class to trust him" and that "he needs to work on writing and peer relationships". (T. 122A).  Shaquille's teachers noted that he displayed "satisfactory" effort with interactive skills including working and cooperating with others, being courteous and respectful to others, respecting his environment and following school rules. (T. 122).

In March 2004, Shaquille underwent a Psychoeducational Evaluation by the school psychologist, Margaret Capozzola, at plaintiff's request.  (T. 125).  Plaintiff provided Mrs. Capozzola with details regarding Shaquille's behavioral issues, prior abuse, hallucinations, nightmares and family situation. (T. 125).  Mrs. Capozzola noted that Shaquille's biological father was in jail. (T. 125).  Plaintiff advised that Shaquille experienced anxiety attacks after spending the afternoon with his biological mother. (T. 125).  Mrs. Capozzola consulted with Shaquille's teachers who stated that Shaquille "stole and lied" with no displays of remorse. (T. 125).  The teachers also advised Mrs. Capolozza that Shaquille engaged in inappropriate sexual conversations with his peers.  (T. 125).

---

[14] The exact date that Shaquille transferred to Montessori Magnet School is not in the record.

Mrs. Capozzola performed a series of standardized tests and found that Shaquille's full scale IQ was 93.  (T. 126).  Mrs. Capozzola observed Shaquille in his classroom setting and noted that he displayed disruptive behavior which the teacher indicated was common.  (T. 127).  Mrs. Capozzola noted that Shaquille was "excited to join the examiner" and "quickly made himself comfortable and began conversational speech". (T. 127).

Mrs. Capozzola recommend that Shaquille have a "special friend at school" as he needed to "feel connected and cared about at school". (T. 128). Mrs. Capozzola noted that Shaquille required significant teacher interaction and close contact with home to make sure he met the demands of school. (T. 129).  Mrs. Capozzola noted that she would discuss Shaquille's eligibility for special education services with the Committee for Special Education. (T. 128).

### 3.      Academic Year 2004 - 2005 - Fourth Grade [15]

In November 2004, the Committee on Special Education met to review Shaquille's educational plan. (T. 221-236).  The 2004-2005 Individualized Education Program (IEP) classified Shaquille as having an "emotional disturbance" and the Committee recommended that Shaquille be placed in Special Education Programs, specifically in a self contained classroom setting with counseling. (T. 227, 234).  The IEP committee noted:

-      Requires significant amount of teacher instruction to remain focused
       and to complete assignments.
-      Close contact between home and school needs to be maintained.
-      States that  nobody likes him.
-      Wants to be the center of attention.
-      Often will say things of an inappropriate nature to peers.
-      History of being asked to leave summer programs due to behavioral issues.

---

[15] These records were submitted by plaintiff for consideration by the Appeals Council. (T. 237).  Evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record to be considered on judicial review of the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  Although the Appeals Council denied review of the ALJ's decision, it expressly considered the new evidence. (T. 6).  Thus, the new evidence is part of the administrative record for purposes of judicial review.  The Court further notes that defendant does not object to the inclusion of these records.

- Quite active within the classroom.
- Moods can change several times during the day. (T. 227).

The committee further found that Shaquille:

- Requires significant teacher interaction to initiate and complete assignments.
- May need additional prompting from teacher and her close proximity to focus. (T. 228).

The committee recommended that Shaquille be seated close to an adult/teacher daily for "the duration of structured activity". (T. 229).

In December 2004, Shaquille was enrolled in special education classes at Schuyler Achievement Academy due to "his inability to focus in a regular education setting". (T. 218-219). On February 18, 2005, Shaquille's teacher, Joseph Smith, prepared a narrative progress report and stated that Shaquille was referred to his "12:1:1 setting due to an inability to focus". (T. 219). Mr. Smith noted that Shaquille was easily distracted and needed special seating arrangements. (T. 219). Mr. Smith stated that Shaquille participated well in class and that "[Shaquille] is an independent learner but has difficulty with relationships with his peers". (T. 219). Mr. Smith stated that Shaquille was very consistent with class and home assignments but that "[Shaquille] is a sensitive child in need of a great deal of support". (T. 219).

On February 17, 2005, Ms. Iglesias, the school social worker, wrote a letter to plaintiff. (T. 218). Ms. Iglesias stated that Shaquille was the only student from Schuyler to represent the school in the local Spelling Bee. (T. 218). Ms. Iglesias noted that Shaquille "responded well" to her and to other adults but that he was working to improve his interpersonal relationships with his peers. (T. 218).

### C.   Consultative Examinations

#### 1.   John Seltenreich, M.D.

On April 29, 2003, Dr. Seltenreich performed a psychiatric evaluation at the request of the agency. (T. 87). Dr. Seltenreich noted that Shaquille's history (including his history of abuse) was provided by plaintiff. (T. 87). Plaintiff advised that Shaquille had no history of psychiatric hospitalizations or outpatient mental health treatment. (T. 87). Plaintiff stated that Shaquille received counseling on a weekly basis from Joan Franco. (T. 87). Plaintiff reported that Shaquille had difficulty sleeping, nightmares, a pattern of stealing and lying, behavioral difficulties and difficulty with attention and impulse. (T. 87). Shaquille stated that he was sometimes depressed and experienced auditory hallucinations consisting of simple words. (T. 87). Dr. Seltenreich noted Shaquille's father had problems with substance abuse and that Shaquille may have observed his sister's murder. (T. 88).

Upon examination, Dr. Seltenreich found Shaquille restless but cooperative, with fluent speech and age appropriate language and expressions. (T. 88). Dr. Seltenreich noted Shaquille was mildly anxious, dysphoric and easily distracted. (T. 89). Dr. Seltenreich noted Shaquille's intellectual functioning was average, his memory was grossly intact and his insight was limited and judgment poor at times and "quite good" at other times. (T. 89). Dr. Seltenreich performed intelligence testing and concluded that Shaquille's IQ was 109. (T. 93). Dr. Seltenreich diagnosed Shaquille with post traumatic stress disorder, dysthymia, and noted that ADHD needed to be "ruled out". (T. 90). Dr. Seltenreich opined that Shaquille had some problems with understanding and following directions and maintaining social behavior. (T. 89). Dr. Seltenreich opined that Shaquille's problems interacting with his peers and the results of the examination were "consistent with allegations of a mental health problem but not a learning disorder". (T. 89). Dr. Seltenreich noted that Shaquille's reports of voices were not consistent with schizophrenia but more likely "his need for attention from his stepmother". (T. 90).

### 2.      Childhood Disability Evaluation Form

On May 27, 2003, Dr. Karen Prowda, a state agency review physician, prepared a

Childhood Disability Evaluation.[16] (T. 95).  Dr. Prowda indicated that Shaquille's impairments of

post traumatic stress disorder and dysthymic disorder were severe but did not meet, medically

equal or functionally equal a listed impairment. (T. 95). Dr. Prowda found that Shaquille

exhibited less than marked limitations in the domains of attending and completing tasks,

interacting and relating to others and caring for himself. (T. 97-98).   Dr. Prowda found no other

functional limitations. (T. 97-98).

### D.      Administrative Hearing

On June 25, 2004, a hearing was held before the Administrative Law Judge at which

Shaquille and plaintiff testified.  (T. 249-272).  Plaintiff testified that Shaquille came to live with

her three years ago. (T. 257).  Prior to that, Shaquille resided with his biological mother and her

"boyfriends" in Utica.  (T. 257). Plaintiff described Shaquille as a "pleasant" child who is "eager

to learn". (T. 266).  Plaintiff stated that Shaquille does not have any physical problems and that he

is able to care for his personal needs and understands and follows safety rules.  (T. 252, 257).

Plaintiff testified that Shaquille is responsible for and completes chores around the home. (T.

264).

Plaintiff stated that Shaquille was scheduled to enter the fourth grade in a special

education class for emotionally disturbed children pursuant to Education Law § 504. (T. 252-

253).  Plaintiff testified that Shaquille received "poor grades" but that he excelled in reading and

---

[16] The form allows an individual to indicate whether a claimant's condition meets, medically equals, or functionally equals a presumptively disabling condition identified in the listing of impairments set forth in the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  The form also allows the individual to rate the degree of limitation in several areas of development or functioning in order to determine whether a condition functionally equals a listed impairment.  *Id.*

that he "loves doing projects".  (T. 253, 255).  Plaintiff stated that Shaquille's teachers told her that academically, he is "good" but that his behavior is "poor".  (T. 254).  Plaintiff testified that Shaquille's "poor behavior" in school consists of stealing, lying to his teachers, failing to follow instructions, speaking of "sexual" issues with his peers, cursing and being unable to sit during class. (T. 254, 256).  Plaintiff testified that during the prior school year, she received three phone calls a week from school regarding Shaquille's behavior.  (T. 256).  Plaintiff also stated that Shaquille was sent to the principal's office twice a week. (T. 256).

Plaintiff testified that Shaquille loves to play with his friends and "sometimes fights" which plaintiff described as "normal fighting". (T. 261).  Plaintiff testified that her relationship with Shaquille is "excellent" and that he gets along with other adults. (T. 261, 263).  Plaintiff stated that Shaquille does not get violent but prior to taking medication, "[Shaquille] held a boy down and beat him up". (T. 262).  Plaintiff testified that Shaquille is "sometimes remorseful" when he hurts others. (T. 262).

Shaquille testified that he liked reading at school, basketball and baseball. (T. 268).  Shaquille testified that he liked to play outside but that sometimes other children "annoyed him" and "called him names". (T. 270).   Shaquille testified that he liked school but that he gets in trouble and goes to the principal's office "a lot". (T. 271).  Shaquille stated that he also gets in trouble on the bus. (T. 271).

### III.    PROCEDURAL HISTORY

On March 18, 2003, plaintiff protectively filed an application on Shaquille's behalf for supplemental security income ("SSI") benefits.  (T. 40).  On June 2, 2003, the application was denied.  (T. 18).  Plaintiff requested a hearing which was held before Administrative Law Judge ("ALJ") Thomas P. Zolezzi on June 25, 2004.  (T. 34).  On August 23, 2004, the ALJ found that

Shaquille was not under a disability.  (T. 11-17).  On June 3, 2005, the Appeals Council denied

plaintiff's request for review, rendering the ALJ's decision the final determination of the

Commissioner.  (T. 3).  Exhausting all her options for review through the Social Security

Administration's tribunals, plaintiff brings this appeal. (Dkt. No. 1).

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he

has a medically determinable physical or mental impairment, which results in marked
and severe functional limitations, and which can be expected to result in death or
which has lasted or can be expected to last for a continuous period of not less than 12
months.

42 U.S.C. § 1382c(a)(3)(C)(i).  That definitional provision goes on to exclude from coverage any

"individual under the age of 18 who engages in substantial gainful activity. . . ."  42 U.S.C. §

1382c(a)(3)(C)(ii).  The agency has prescribed a three-step evaluative process to be employed in

determining whether a child can meet the statutory definition of disability.  20 C.F.R. § 416.924;

*Kittles ex rel. Lawton v. Barnhart*, 245 F. Supp.2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v.

Barnhart*, 2003 WL 21032012, at *7 (S.D.N.Y. 2003).  The first step of the test, which bears

some similarity to the familiar, five-step analysis employed in adult disability cases, requires a

determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. §

416.924(b); *Kittles*, 245 F. Supp.2d at 488.  If so, then both statutorily and by regulation the child

is ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, then the second step requires

examination of whether the child suffers from one or more medically determinable impairments

that, either singly or in combination, are severe – that is, which causes more than a minimal

functional limitation.  20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp.2d at 488; *Ramos*, 2003 WL

21032012, at *7.  If the existence of a severe impairment is discerned, the agency must next

determine whether it meets or equals a presumptively disabling condition identified in the listing

of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.*

Equivalence to a Listing can be either medical or functional.  20 C.F.R. § 416.924(d); *Kittles*, 245

F. Supp.2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If an impairment is found to meet, or

qualify as medically or functionally equivalent to, a listed disability, and the twelve month

durational requirement is satisfied, the child will be deemed disabled.  20 C.F.R. § 416.924(d)(1);

*Ramos*, 2003 WL 21032012, at *8.

Under the Social Security Regulations (the "Regulations"), analysis of functionality is

performed by consideration of how a claimant functions in six areas which are denominated as

"domains," and described as "broad areas of functioning intended to capture all of what a child

can or cannot do."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. Those

prescribed domains include:

> (i) [a]cquiring and using information;
> (ii) [a]ttending and completing tasks;
> (iii) [i]nteracting and relating with others;
> (iv) [m]oving about and manipulating objects;
> (v) [c]aring for [oneself]; and
> (vii) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation, defined

as when the impairment "interferes seriously with [the claimant's] ability to independently

initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), is found in two of the

listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  Functional

equivalence also exists in the event of a finding of an "extreme" limitation, meaning "more than

marked," representing an impairment which "interferes very seriously with [the claimant's]

ability to independently initiate, sustain, or complete activities," and this rating is only "give[n] to

16

the worst limitations". 20 C.F.R. § 416.926a(e)(3)(i); *see also Morgan v. Barnhart,* 2005 WL 925594, at *11 (S.D.N.Y. 2005).

Using the three-step disability evaluation, the ALJ found at step one that Shaquille has never engaged in any substantial gainful activity. (T. 16). At step two, the ALJ concluded that Shaquille has severe impairments consisting of severe post-traumatic stress disorder and depressive disorder. (T. 16). At the third step of the analysis, the ALJ found that none of Shaquille's severe impairments meet, medically equal, or functionally equal any of the listed, presumptively disabling conditions set forth in Appendix 1 of the Regulations. (T. 16). The ALJ evaluated Shaquille's functional abilities in the six domains established by 20 C.F.R. § 416.926a(b)(1) and found that Shaquille's limitations were "marked" with respect to interacting and relating to others. (T. 16). The ALJ found that Shaquille's limitations were "less than marked" with regard to attending and completing tasks and health and physical well being. (T. 15-16) . The ALJ found that Shaquille had no limitation with regard to acquiring and using information, in his ability to move about and manipulate objects, and his ability to care for himself. (T. 16). Consequently, the ALJ concluded that Shaquille was not disabled. (T. 16).

## V.    DISCUSSION

Under 42 U.S.C. §§ 405(g) and 1383(c)(3),[17] the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v.*

---

[17] Section 1383(c)(3) makes section 405(g) applicable to the SSI program and provides the basis for this Court's jurisdiction and limitations of its review.

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson*, 817 F.2d at 986.

In seeking federal judicial review of the Commissioner's decision denying Shaquille benefits, plaintiff contends that the ALJ erred by failing to find: (1) that Shaquille's impairments met or equaled Listings 112.04; 112.06; and 112.08; and (2) that Shaquille had an extreme impairment in the domain of interacting and relating to others and a marked impairment in the domains of attending to/completing tasks and caring for himself. (Dkt. No. 14).

## A.    Listed Impairments

Plaintiff argues that Shaquille's impairments meet or equal the Listings found at 112.04 (affective disorders), 112.06 (anxiety disorders) and 112.08 (personality disorders).[18] (Dkt No.14, p. 12). Plaintiff claims that the ALJ failed to provide rationale for why the credible findings of Shaquille's educators and medical providers were disregarded. (Dkt. No. 14, p. 24). The

---

[18] Plaintiff cites to 112.06 in the introductory paragraph of the Argument. However, plaintiff fails to provide any analysis or argument as to how Shaquille's impairments meet the criteria of 112.06.

Commissioner contends that Shaquille's impairments do not satisfy the criteria of any of the aforementioned Listings.  (Dkt. No. 17, p. 7-8)..

By regulation, the Commissioner has set forth a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected.  20 C.F.R. Pt. 404, Subpt. P, App. 1; *Lusher ex rel. Justice v. Comm'r of Social Sec.*, 2008 WL 2242652, at *6 (N.D.N.Y. 2008).  For both adults and children, "if an applicant satisfied the Listings, the applicant was presumed to be disabled, and did not have to prove 'whether he [or she] actually can perform his [or her] own prior work or other work.'" *Lusher*, 2008 WL 2242652, at *6 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 529-530 (1990)).

The Commissioner's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, including any functional limitations that result from the impairment, with the corresponding criteria shown for the listed impairment. 20 C.F.R. §§ 416.925, 416.926a; *see also Giles v. Chater*, 1996 WL 116188, at *5-6  (W.D.N.Y. 1996).  Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings. *Booker v. Heckler*, 1984 WL 622, at *3 (S.D.N.Y. 1984).  Mere recitation of the medical evidence is insufficient unless the reports referred to contain substantiated conclusions concerning the Listings, and the ALJ expressly adopts the reasoning of those conclusions. *Id*.  The ALJ (not the Commissioner's lawyers) must  "build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review".  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citations omitted).  A court "cannot ... conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the

weight accorded the evidence considered." *Morgan on Behalf of Morgan v. Chater*, 913 F.Supp.184, 188 -189 (W.D.N.Y. 1996) (quoting *Ryan v. Heckler*, 762 F.2d 939, 941 (11th Cir.1 985)).

In this case, the ALJ found:

The medical evidence establishes that the claimant has severe post-traumatic stress disorder and depressive disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P., Regulations No. 4. (T. 16).

The ALJ further concluded that:

Since there are objective findings to support some of the alleged complaints it may be found that claimant's impairments in combination are severe.

However, objective findings would not supported [sic] conclusion that any of the claimant's impairments, considered either singly or in combination, are of the degree of severity of any listed impairments in Appendix 1 to Subpart P. of the Regulations. (T. 15).

The ALJ did not specify any particular Listing.  Further, the ALJ did not provide any discussion or analysis explaining his determination and failed to state what evidence he rejected or relied upon in making this determination.

## 1.      Listing 112.04

To meet or equal Listing 112.04, a claimant's condition must satisfy two criteria set forth in Paragraphs A and B. *See Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 648 (8th Cir. 2004). The applicable portion of Paragraph A requires "medically documented persistence, either continuous or intermittent" of a major depressive syndrome that is characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

a.  Depressed or irritable mood; or
b. Markedly diminished interest or pleasure in almost all activities; or

20

c.  Appetite or weight increase or decrease, or failure to make expected weight gains; or disturbance with change in weight; or
d. Sleep disturbance; or
e. Psychomotor agitation or retardation; or
f. Fatigue or loss of energy; or
g. Feelings of guilt or worthlessness; or
h. Difficulty concentrating or thinking; or
i. Suicidal thoughts or acts; or
j. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Pt. 404, Subpt. P, App. 1§ 112.04; *see also Garrett*, 366 F.3d at 648.   To satisfy

Paragraph B, the child must demonstrate marked impairments in two of the following: age-

appropriate cognitive/communicative functioning; age-appropriate social functioning; age-

appropriate personal functioning; or marked difficulties in maintaining concentration, persistence

or pace.  20 C.F.R. Part 404, Subpt. P, App. 1 § 112.02(B)(2).

In this case, the Court finds that the ALJ failed to apply the appropriate legal standard and

further, that substantial evidence does not support the ALJ's conclusion.  The Court will not

engage in a discussion which is a task properly left to the Commissioner, however, given the

similarities between Shaquille's symptoms and the criteria of Listing 112.04, the ALJ should have

given some explanation as to why the impairment does not meet the criteria.  *See Giles*, 1996 WL

116188, at *5-6.   The ALJ failed to adequately discuss the significance of Nurse Imperiale's

continued diagnosis of depressive disorder with psychosis, possible ADHD and increased mood

instability.  The ALJ also failed to address Dr. Seltenreich's opinion that "ADHD should be ruled

out" and Dr. Seltenreich's diagnosis of post traumatic stress disorder and dysthymia.  (T. 90).

Further, there is evidence that Shaquille suffered from auditory and visual hallucinations,

decreased sleep, feelings of worthlessness and limitations in cognitive functioning and

concentration.  (T. 123, 125, 135, 151).  The ALJ's failure to explain is plain error.  *See Morgan*,

913 F.Supp. at 188-189 (holding that a one-sentence denial is insufficient to support the

determination, especially in light of the considerable evidence to the contrary).   As the ALJ

improperly disregarded "highly probative evidence", the case is remanded to the Commissioner

for further proceedings.  *Wilson v. Callahan*, 1997 WL 714863, at *5 (W.D.N.Y. 1997).

### 2.        Listing 112.06 and 112.08

Listing 112.06 requires medically documented findings of one of several factors,

including "excessive anxiety manifested when the child is separated" from a parent.  20 C.F.R. Pt.

404, Subpt. P, App. 1, § 112.06. The anxiety must also result in at least two of the age-specific

findings listed in § 112.02(B)(2). *Id*. at § 112.02(B)(2).

The required level of severity for Listing 112.08, Personality Disorders, is met when there

is "[d]eeply ingrained, maladaptive patterns of behavior, associated" with seclusiveness or autistic

thinking, pathologically inappropriate suspiciousness or hostility, oddities of thought, perception,

speech, and behavior, persistent disturbances of mood or affect, pathological dependence,

passivity, or aggressiveness, or intense and unstable interpersonal relationships with impulsive

and exploitative behavior resulting in a finding of at least two marked impairments in

age-appropriate functions of cognitive/communicative, social functioning, personal functioning,

or concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.08; *see also*

*Morgan*, 913 F.Supp. at 190.

Although it is preferable that the ALJ address a specific Listing, failure to do so is not

reversible error if the record supports the overall conclusion.  *See Lusher*, 2008 WL 2242652, at

*6; *see also Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001) (holding that the ALJ's

failure to explain why the plaintiff did not meet a specific listing  was not error as substantial

evidence in the record indicated that the plaintiff did not satisfy the Listing); *Briggs v. Callahan*,

139 F.3d 606, 609 (8th Cir. 1998) (stating that "although the ALJ did not specifically discuss

[the] condition in the context of listing 112.05(D)," the record supported the conclusion).  The

ALJ is not required to discuss Listings for which no evidence exists.  *RJM ex rel. Moore v.*

*Astrue*, 2008 WL 833194, at *2, n. 3 (S.D. Ind. 2008) (holding that the ALJ's failure to discuss

Listing 112.02 (organic mental disorder) was not an error as the plaintiff cited to no evidence of

any diagnoses of personality disorder).

   In this case, substantial evidence in the record suggests that Shaquille's impairments do

not meet the requirements of Listings 112.06 and 112.08.  Plaintiff argues that Shaquille was

diagnosed with post-traumatic stress disorder which "is clearly contributing to a personality

disorder". (Dkt. No. 14, p. 15).  However, plaintiff does not cite to any portion of the record that

supports that assertion.  Further, plaintiff does not cite to any evidence that Shaquille was

diagnosed with a personality or anxiety disorder by any doctor or therapist.  In fact, Dr.

Seltenreich concluded that Shaquille's auditory hallucinations were not consistent with

schizophrenia. (T. 90).  Accordingly, the ALJ's failure to specifically mention and analyze the

aforementioned Listings does not warrant remand.

### B.  Functional Domains

#### 1.  Attending and Completing Tasks

   Plaintiff contends that the ALJ erred by failing to find that Shaquille has a marked

impairment in the domain of attending and completing tasks. (Dkt. No. 14, p. 19).  The domain of

attending and completing tasks gauges how well a child is able to focus and maintain attention.

20 C.F.R. § 416.926a(h).  For children of Shaquille's age (ages 6 to 12), the regulations provide:

> When you are of school age, you should be able to focus your attention in a variety
> of situations in order to follow directions, remember and organize your school
> materials, and complete classroom and homework assignments.  You should be able
> to concentrate on details and not make careless mistakes in your work (beyond what
> would be expected in other children your age who do not have impairments).  You
> should be able to change your activities or routines without distracting yourself or

others, and stay on task and in place when appropriate.  You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.  You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

Some examples of limited functioning include: (1) being "easily startled, distracted, or over reactive to sounds, sights, movements, or touch"; (2) "being slow to focus on, or fail to complete activities of interest"; (3) becoming repeatedly sidetracked from activities or frequently interrupting others; and (4) being easily frustrated and giving up on tasks.  *See* 20 C.F.R. § 416.926a(h)(3)(i)-(v); *see also Morgan*, 2005 WL 925594, at *13.

The ALJ found that Shaquille  has "less than a marked impairment" in this domain.  (T. 16).  To support that conclusion, the ALJ cited to Shaquille's a progress report from Montessori Magnet School for the 2003 - 2004 academic school year and to plaintiff's testimony.  The ALJ concluded:

> Exhibit 12F indicates that claimant was very successful when he put effort into his work, although he would rush through his work making careless mistakes and would get angry if he had to fix his work.  His guardian testified that he would do his chores if she kept after him. (T. 15-16).[19]

The ALJ did not cite to any other evidence in support of his conclusion despite the existence of evidence favoring a marked limitation in this domain.   The ALJ neglected to adequately evaluate the complete academic picture including disciplinary records,  Mrs. Capozzola's evaluation and Ms. Schofield's ADHD assessment.  These records document Shaquille's behavioral and academic problems.  *See Matos ex rel. Mota v. Barnhart*, 2007 WL 943654, at *10 (S.D.N.Y. 2007).

---

[19] The citation to "Exhibit 12F" in the ALJ's decision is a typographical error.  Exhibit 12F  is a Subpoena to the County of Albany Crime Victim and Sexual Violence Center.  A review of the entire record reveals that the reference is to Exhibit 7F, records from the Albany County School District.  (T. 122).

Shaquille's educators and doctors/therapists described him as "easily distracted" and noted that he easily lost his temper, rushed through work at school and "very often talked excessively". (T. 89, 90, 122-123, 219).  Moreover, Dr. Seltenreich and Nurse Imperiale both note that Shaquille may suffer from "ADHD". (T. 90, 153).  The ALJ did not address or discuss this evidence.

Moreover, plaintiff's "new evidence" (submitted to the Appeals Council) is highly probative on this issue and likely to affect the ALJ's consideration.  This new evidence, including the IEP evaluation and report from Shaquille's special education teacher, may persuade the ALJ to find that Shaquille had a marked impairment in this domain.  *See Pollard v. Halter*, 377 F.3d 183, 194 (2d Cir. 1994).   Consequently, the Court finds that the ALJ's decision on this point is legally deficient and not supported by substantial evidence.

### 2.       Interacting and Relating to Others

Plaintiff contends that the ALJ erred by failing to find that Shaquille has an extreme impairment in the domain of interacting and relating to others.  The domain of interacting and relating with others considers how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  20 C.F.R. § 416.926a(i).  For school-age children of Shaquille's age (age 6 to attainment of age 12), the Regulations further provide:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

The SSA regulations provide that an impairment is an "extreme" limitation when:

[The] impairment interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities. [The child's] day-to-day functioning may be very seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked"... [but] does not necessarily mean a total lack or loss of ability to function.

*Sarauw v. Barnhart*, 2006 WL 2135775, at *3-4 (S.D.N.Y. 2006); 20 CFR § 416.926a(e)(3)(i). Alternatively, when a child suffers from multiple impairments within a single domain, each of which, when considered separately, imposes a less-than-marked limitation, the combined result nonetheless may be marked or extreme. *See, e.g., Encarnacion v. Barnhart*, 191 F.Supp.2d 463, 474 (S.D.N.Y. 2002) (two less-than-marked limitations in the area of social functioning may cumulatively contribute to the finding of a marked or extreme limitation in the area of social functioning).

In this case, the ALJ concluded:

The evidence indicates that the claimant has had behavior problems at school and that peers don't trust him, but he does enjoy playing with his friends.  Nevertheless he had been found stealing.  Although his medication is helping, with respect to "interacting and relating to others" it may be found that he has marked limitations. (T. 16).

Upon review of the transcript, the Court concludes that the ALJ's decision cannot withstand analysis.  First, the Court notes the ALJ's determination is poorly worded and confusing.  The ALJ stated that "it may be found that he has marked limitations".  (T. 16) (emphasis supplied).  Plaintiff and defendant assume that the ALJ concluded that plaintiff suffered from a marked limitation in this domain.  (Dkt. No. 10, p. 17; Dkt. No. 17, p. 14). However, the intent of the ALJ is unclear and requires remand for clarification.

Moreover, the domain of interacting and relating with others concerns more than fights and disruptive behavior. *McClain v. Barnhart*, 299 F.Supp.2d 309, 326 (S.D.N.Y. 2004). Indeed, the ALJ failed to address evidence that may support a finding of "extreme" limitations. The ALJ failed to discuss plaintiff's inappropriate sexual conversations with his peers, his hallucinations and plaintiff's unexplained physical aggressiveness towards his peers/classmates; (T. 125, 136, 152-154). The ALJ also failed to analyze plaintiff's disruptive behavior in class, lack of respect for his peers and anxiety after spending time with his biological mother. (T. 124-125). Further, plaintiff's "new evidence", most significantly, the IEP evaluation and Mr. Smith's report, must be considered.

In light of the foregoing, upon remand, the ALJ must re-evaluate this domain and the evidence that may support a finding of "extreme" limitations.

### 3.    Caring for Yourself

Plaintiff argues that the ALJ erred by failing to find that Shaquille has a marked impairment in the domain of caring for oneself. (Dkt. No. 14, p. 21). The domain of caring for yourself considers how well a child maintains a healthy emotional and physical state, including how well he has his physical and emotional needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he cares for his own health, possessions and living area. 20 C.F.R. § 416.926a(k). For school-age children of Shaquille's age (age 6 to attainment of age 12), the Regulations further provide:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe

or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

The ALJ cited to plaintiff's testimony and found that Shaquille displayed no evidence of any limitations in this domain. (T. 16).   The Court finds that substantial evidence exists to support the ALJ's determination.  The domain of caring for yourself includes whether you take care of your own health, possessions, and living area.  20 C.F.R. § 416.926a(k).  Plaintiff testified that Shaquille was able to bathe, dress and handle his own personal care. (T. 257). Plaintiff also testified that Shaquille is responsible for and completes chores around the home. (T. 264).  Plaintiff testified that Shaquille understands and follows basic safety rules with the exception of watching for cars when he crossed the street. (T. 257-258).  After examining Shaquille, Dr. Seltenreich opined that Shaquille was "aware of danger and the need to take precautions".  (T. 93).

As noted in the Regulations, school-age children should be able to identify those circumstances when they feel good about themselves and when they feel bad.  20 C.F.R. § 416.926a(k)(2)(iv).  In December 2003, Shaquille told Dr. Imperiale that he "did a little accident, knocked 2 kids heads together in school". (T. 151).  Dr. Imperiale noted that Shaquille was "embarrassed by his actions". (T. 151).   Plaintiff testified that Shaquille is "sometimes remorseful" when he hurts others. (T. 221).

In light of the foregoing, the Court finds that the ALJ's determination that Shaquille suffered from no impairment in the domain of caring for himself is supported by substantial evidence.

## VI.    CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: August 4, 2008
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge